UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

VICTOR CAMINATA, individually;

      Plaintiff,

-v-

No.
Hon.

COUNTY OF WEXFORD, a Municipal corporation;
TRENT TAYLOR, in his individual capacity;
BRIAN ROOD, in his individual capacity ;
CHAD SPRIK, in his individual capacity ; and
MICHAEL JENKINSON, in his individual capacity;

      Defendants.
_____

**WOLFGANG MUELLER (P43728)**
Olsman, Mueller, Wallace &
MacKenzie, P.C.
Attorneys for Plaintiff
2684 West Eleven Mile Road
Berkley, MI 48072
(248) 591-2300
wmueller@olsmanlaw.com
_____

## COMPLAINT AND JURY DEMAND

    NOW COMES the Plaintiff, VICTOR CAMINATA, individually, by and through his attorneys, OLSMAN, MUELLER, WALLACE & MacKENZIE, P.C., by WOLFGANG MUELLER, and does hereby complain against the Defendants in this civil action, stating unto this Court as follows:

    1.    This is an action for damages brought pursuant to 42 USC §§1983 and 1998, the Fourth and Fourteenth Amendments to the United States Constitution against Defendants, TRENT TAYLOR, in his individual capacity; BRIAN ROOD, in his individual capacity; CHAD SPRIK, in his individual capacity ; MICHAEL JENKINSON, in his

individual capacity; and the COUNTY OF WEXFORD, a municipal corporation. Jurisdiction is founded upon 28 USC §1331 and 28 USC §1343.

    2.    Forum is proper based on the situs of the incident, which occurred in the COUNTY OF WEXFORD.

    3.    At all pertinent times Plaintiff, VICTOR CAMINATA, was a citizen of the COUNTY OF WEXFORD, State of Michigan.

    4.    At all pertinent times, Defendant, TRENT TAYLOR ("TAYLOR"), was employed as a Sergeant by the Wexford County Sheriff's Office, a department of the COUNTY OF WEXFORD, a Municipal corporation, and was acting under color of law.

    5.    At all pertinent times, Defendant, BRIAN ROOD ("ROOD"), was employed as a Sergeant by the Wexford County Sheriff's Office, a department of the COUNTY OF WEXFORD, a Municipal corporation, and was acting under color of law.

    6.    At all pertinent times, Defendant, CHAD SPRIK ("SPRIK"), was employed as a Deputy by the Wexford County Sheriff's Office, a department of the COUNTY OF WEXFORD, a Municipal corporation, and was acting under color of law.

    7.    At all pertinent times, Defendant, MICHAEL JENKINSON ("JENKINSON"), was employed as a Sergeant/Fire Investigator for the Michigan State Police Department, and was acting under color of law.

    8.    That at all times relevant hereto, the Defendant, COUNTY OF WEXFORD, a Municipal corporation, was the employer of the individual Defendants, TAYLOR, ROOD, and SPRIK.

## **GENERAL ALLEGATIONS**

9. On March 2, 2008, shortly before 11:57 a.m., a fire broke out at 402 W. 32 Rd., Boon Twp., in Wexford County.

10. Plaintiff, who lived in the home with his girlfriend, Nicole Vanderhoef, and her son, Tyler Vanderhoef, first noticed smoke emanating from the wall surrounding the chimney in the living room.

11. Tyler Vanderhoef noticed smoke at the same time.

12. Plaintiff immediately ran to the basement and grabbed a fire extinguisher to put out the fire in the wood burning stove, where he had last placed logs at approximately 9:30 – 10:00 a.m.

13. Plaintiff had earlier placed logs in the stove at approximately 2 a.m., and at 6:00 a.m., when Nicole Vanderhoef left to go to work.

14. After extinguishing the fire in the wood burning stove, Plaintiff grabbed a Chem-stick and ran outside. He grabbed a ladder, went up to the roof, and threw the Chem-stick down the chimney to help extinguish the chimney fire.

15. Plaintiff then called 911 at 11:57 a.m.

16. The fire caused the roof to collapse and destroyed the home.

17. On March 2, 2008, shortly after the fire was extinguished by the Boon Twp. Fire Department, Defendant, BRIAN ROOD, a Sergeant with the Wexford County Sheriff's Department, was sent to the scene. ROOD, who had fire investigation training and experience, examined the scene, including the exposed chimney on the first floor of the home.

18. ROOD took photographs of the chimney area, including several pieces of wood that he pulled off of the chimney's first-floor west face in order to examine the chimney more closely (the "Rood photographs").

19. The wood surrounded the chimney and chimney chase, which also housed a metal chimney pipe the led from the basement boiler to a vent in the roof.

20. ROOD also noted that a thimble hole, approximately six inches in diameter, was uncovered at the time of his inspection, and noted the position of the boards he ripped off the west face of the chimney on the first floor (the "Rood observations") (collectively the "Rood evidence").

21. It was later determined that the thimble hole had previously been used to vent an old stove located on the first floor, which had not been present for several years before the March 2, 2008, fire.

22. ROOD did not disclose the existence of the Rood evidence to the Wexford County Prosecutor's Office, which would later prosecute Plaintiff for the crime of arson.

23. On or about March 4, 2008, Defendant, JENKINSON, received a call from MSP Trooper Falan requesting that he go to the scene of the fire to conduct an origin and cause investigation.

24. Defendant, JENKINSON, conducted his origin and cause investigation on March 4, 2008, after receiving a signed Consent to Search form executed by Plaintiff.

25. Upon completion of his March 4, 2008, inspection, JENKINSON wrote a report, concluding that the origin of the fire was located at *"the base of the opening through the basement ceiling around the metal flue of the chimney."*

26. JENKINSON specifically examined the thimble hole in the chimney.

27. JENKINSON purportedly ruled out the chimney thimble hole being the origin of the fire based on his reconstruction of wood boards covering the thimble hole, concluding that the boards would have burned and been consumed if the fire originated at the thimble hole. Since his reconstruction of the boards showed an unburned wood board over the thimble hole opening, he concluded that the fire could not have originated at that location.

28  JENKINSON further concluded: *"Based upon the evidence and information available at this time, it is my opinion that this is not a chimney fire as reported by the occupant. Human involvement cannot be eliminated at this time."*

29. JENKINSON's report suggested that after his March 4 inspection, the Michigan State Police purportedly received an anonymous tip that Plaintiff had bragged that he could burn a house down without getting caught because of his experience as a fire fighter. JENKINSON then returned to the house on March 18, 2008, to conduct a second origin and cause investigation.

30. JENKINSON met Safeco Insurance Company's retained origin and cause investigator, James Raad, at the scene.

31. During the scene inspection, JENKINSON spoke with Defendants, ROOD and TAYLOR.

32. During the second scene inspection, JENKINSON discovered *"two small pockets of deep charring"* in the basement ceiling floor joists. He reported that the two pockets *"were unconnected to the heavy burning on the insides of the joists. These deep, isolated pockets of burning certainly have the appearance and are consistent with a heavy, direct flame source having been applied, similar to that of a propane torch."*

33. JENKINSON's report was intended to have the readers, including Defendant, TAYLOR, and the Wexford County warrant prosecutor, conclude that the "two small pockets of deep charring" were evidence that Plaintiff had unsuccessfully tried to start a fire in those locations, thereby inferring intent to start the fire with a device similar to a propane torch.

34. In JENKINSON's reports, dated March 4 and 26, 2008, JENKINSON knowingly made false statements and material omissions, including the following:

> A. There is a large section of the wood structure which covered the west side of the masonry chimney that is lying on the floor. Repositioning this structure and inspecting its backside show heavier fire damage on its south side, in other words this structure shows fire attack coming from the area of the metal chimney. Approximately 5 ft. above floor level on the west side of the masonry chimney there is a hole cut through the masonry. There is the remains of a metal cover. This was apparently done years ago as the occupant reported that years ago before they owned the house there was apparently a wood stove in this area on the main floor. Again, in repositioning the wood and finding the lack of fire damage on the back side of it does not suggest that fire escaped through this opening. That would also contradict what the occupant advised regarding the use of the wood stove over the past two years that they have resided in this house. (March 8, 2008, report, pp. 6-7)

> B. Also noted, were two small pockets of heavy, unconnected burning to the outer sides of the joists surrounding the opening where the metal flue passed through. In other words, the inside of the joists that faced the metal flue had moderate to heavy, even charring and burning, while these two small pockets of deep charring were on the outside of the joists, and were unconnected to the heavy burning on the insides of the joists. These deep, isolated pockets of burning certainly have the appearance, and are consistent with a heavy, direct flame source having been applied, similar to that of a propane torch. (March 26, 2008, report, p. 1)

35. JENKINSON testified at the Preliminary Exam on November 25, 2008. He testified that there were *"some other small sections on the joist adjacent to [the floor joists in the chimney chase], that had some small pockets of burning that were*

6

*unconnected and isolated, that – or similar, or with the appearance of having been in contact with a direct heat source, such as a blow torch."*

36.     JENKINSON further testified that the fire could not have originated at the thimble hole because *"the section of wood that covered [the thimble hole] was still in relatively good shape, and that was repositioned, and the wood going across these wasn't burned.  Had that been the problem, that would have been the initial source of ignition, that certainly would have been destroyed and the fire would have fired up from there. . . . Okay, so that was eliminated."*

37.     JENKINSON's  photographs of the *"two small pockets of heavy, unconnected burning"* on the outer sides of the floor joist, in fact showed daylight coming through, indicating that there was fire communication through the wood floor joists, and an alternative hypothesis for the charred wood that he could not rule out.

38.     JENKINSON intentionally, or with reckless disregard for the truth, chose to omit any reference of fire communication through the wood joists in the *"small pockets of heavy, unconnected burning"* or "failed ignition attempts," as such fire communication would have negated the element of intentional ignition of the fire, and would have resulted in a finding of no probable cause that a crime had been committed.

39.     JENKINSON intentionally, or with reckless disregard for the truth, chose to improperly "reposition" the boards on the west side of the chimney face, thereby leaving the impression that a wood board had covered the thimble hole, when, in fact, no board covered the thimble hole.  JENKINSON's improper repositioning of the boards allowed him to purportedly rule out the thimble hole location as a feasible alternate hypothesis as to the origin and cause of the fire.

40. JENKINSON's false statements and material omissions were relied upon by Defendant, TAYLOR, who had no fire investigation expertise, in seeking an arrest warrant.

41. JENKINSON's false statements and material omissions influenced the initiation of the prosecution and the finding of probable cause on the charge of arson.

42. Defendant, TAYLOR, as Officer-in-Charge ("OIC") of the investigation, was aware that Defendant, ROOD, had inspected the scene of the fire on March 2, 2008, had taken photographs, and was aware of ROOD's findings regarding the exposed thimble hole.

43. Prior to issuing his Investigator's Report/Request for Warrant, defendant, TAYLOR, reviewed JENKINSON's reports, and knew that JENKINSON's findings regarding the wood boards covering up the thimble hole were contradicted by ROOD's findings and photographs.

44. From March 2, 2008, and continuing through the completion of the trial resulting in Plaintiff's arson conviction on May 14, 2009, neither ROOD nor TAYLOR, ever disclosed to the prosecutor that ROOD's photographs of the wood boards on the chimney's west side contradicted JENKINSON's reconstruction of the wood boards, and that ROOD's observation of the exposed thimble hole contradicted JENKINSON's conclusion of a wood board covering the thimble hole during the fire, though such evidence was in both of their hands.

45. The withheld evidence was apparent and material impeachment evidence, as it would have impeached the origin and cause methodology and conclusions of the prosecution's star expert witness, JENKINSON.

46. The withheld evidence was apparent and material exculpatory evidence, as it would have suggested that there was a reasonable alternative hypothesis for the origin and cause of the fire that could not be ruled out in accordance with the Scientific Method of analysis; thereby requiring a classification of the fire as "Undetermined."

47. With the fire being classified as "Undetermined," there would be no probable cause to conclude that a crime had been committed.

48. On October 2, 2008, Defendant, SPRIK, testified under oath in support of the request for arrest warrant.

49. SPRIK made intentional misrepresentations and/or testified with reckless disregard for the truth of his assertions, in his testimony in support of an arrest warrant.

50. SPRIK's "bare bones" testimony failed to set forth facts necessary to establish probable cause for the issuance of an arrest warrant, despite Judge David Hogg authorizing the warrant.

51. But for Defendant, SPRIK's, intentional misrepresentations and/or representations made with reckless disregard for the truth, there would be no probable cause for the issuance of an arrest warrant for the crime of arson.

52. On October 2, 2008, Plaintiff was charged with the crime of arson.

53 On May 14, 2009, Plaintiff was convicted of arson by a Wexford County jury, and was later sentenced to spend 9-40 years in state prison.

54. On July 2, 2013, after the University of Michigan Innocence Clinic had filed a motion to Vacate the Judgment of Conviction and Order a New Trial, a meeting was held in a Wexford County Court conference room between attorneys representing the

State of Michigan, Victor Caminata, and experts presenting both sides, including JENKINSON.

55. The attorneys and experts reviewed the "Rood photographs," that had purportedly just been discovered the night before, as well as ROOD's statements that the thimble hole was uncovered and that JENKINSON's board reconstruction was inaccurate (the "Rood observations").

56. In agreeing to a new trial, the state prosecutor stated on the record that the newly discovered photographs had caused the state's experts, including JENKINSON, to conclude that the fire should have properly been classified as *"undetermined,"* and that *"actual prejudice"* had occurred. The prosecutor further stated that, based upon the newly discovered evidence, "*there would be a reasonable likelihood of acquittal.*"

57. On January 22, 2014, the date the Wexford County Court was to conduct a three-day evidentiary hearing to determine the reliability of the State's experts' methodologies, the Prosecutor for the State of Michigan dismissed all charges against Plaintiff with prejudice.

58. Had the Rood photographs and Rood evidence been disclosed to the prosecutor and defense, there is a reasonable probability that the result of the criminal case would have been different; i.e., an acquittal, as acknowledged by the prosecutor on July 2, 2013.

59. Due to the conduct of Defendants, TRENT TAYLOR, BRIAN ROOD, MICHAEL JENKINSON, and the COUNTY OF WEXFORD, as set forth below, Plaintiff, VICTOR CAMINATA suffered the following injuries and damages:

    A.    Suffering a deprivation of liberty by being wrongfully incarcerated and imprisoned for a period of over five years;

    B.    Severe emotional distress for the period from his arrest to the present, including, but not limited to: the emotional distress of being charged with felony arson and facing a possible sentence of life in prison; being wrongfully convicted; facing re-trial on charges of arson for a crime the police knew he did not commit;

    C.    Physical manifestations of emotional distress including, but not limited to, sleeplessness, irritability, loss of appetite, headaches, and other symptoms;

    D.    Fright, shock, indignity, humiliation and embarrassment of being wrongfully charged and imprisoned for arson;

    E.    Loss of enjoyment of daily activities including, but not limited to, seeing his children grow up;

    F.    Loss of employment opportunity;

    G.    Loss of his close relationship with his minor daughters;

    H.    Physical injuries while being imprisoned, including being stabbed and assaulted;

    I.    Many of Plaintiff's injuries and damages are likely to be permanent;

    J.    Other damages which may be revealed through discovery.

## COUNT I
## CONSTITUTIONAL VIOLATIONS BY ALL DEFENDANTS

60. Plaintiff incorporates by reference each preceding paragraph as if fully stated herein.

61. Defendants, TAYLOR and ROOD, were under an unwavering legal duty to disclose to the prosecutors all exculpatory and impeachment evidence where its value was apparent, including, but not limited to, the Rood evidence. Defendants' failure to disclose the Rood evidence to the prosecutors resulted in material exculpatory

and impeachment evidence not being turned over to Plaintiff's defense counsel, in violation of the State's *Brady* obligations.

62. Defendants violated Plaintiff's constitutionally-protected rights, including his right to liberty protected by the Due Process clause of the Fourteenth Amendment to the U. S. Constitution, as well as his right to be free from unlawful detention without probable cause, guaranteed by the Fourth Amendment, by the following conduct :

   A. Defendants, TAYLOR and ROOD, deliberately and consciously chose not to disclose material exculpatory and impeachment evidence in their files to the prosecutor or Plaintiff's criminal defense counsel, in violation of their constitutional obligation under *Brady v Maryland*, 373 US 83 (1963) and its progeny, which would have resulted in no arrest warrant being issued, or a finding of lack of probable cause at the preliminary exam or an acquittal at trial;

   B. Defendant, TAYLOR, influenced or participated in the initiation of criminal prosecution when he deliberately and knowingly supplied false information and omitted information which showed a reckless disregard for the truth in requesting an arrest warrant, which was material to a finding of probable cause that Plaintiff had committed the crime of arson, which otherwise would have been lacking;

   C. Defendant, SPRIK, influenced or participated in the initiation of criminal prosecution when he deliberately and knowingly supplied false information and supplied information which showed a reckless disregard for the truth in requesting an arrest warrant, which was material to a finding of probable cause that Plaintiff had committed the crime of arson, which otherwise would have been lacking;

   D. Defendant, JENKINSON, influenced or participated in the initiation of criminal prosecution when he deliberately and knowingly supplied false information and omitted information which showed a reckless disregard for the truth reporting his origin and cause inspection findings, which was material to a finding of probable cause that Plaintiff had committed the crime of arson, which otherwise would have been lacking;

   E. Defendant, COUNTY OF WEXFORD, created policies, practices and customs, including a failure to provide adequate training to its police officers, including Defendants, TAYLOR and ROOD, regarding the sheriff's office's constitutional obligation to turn over

       apparent exculpatory and impeachment evidence to the prosecutors, which demonstrated "deliberate indifference" to the constitutional rights of its citizens, and was the moving force behind the individual Defendants' violations of Plaintiff's constitutional rights;

    F.    Other acts of constitutional violations that will be discovered through the process of discovery.

63. Plaintiff's constitutional rights, which were violated by Defendants, were clearly established before March 2, 2008.

64. As a direct and proximate result of the Defendants' willful violation of his constitutionally-protected rights, Plaintiff was detained without probable cause, charged with crimes he did not commit, wrongfully convicted and imprisoned, and deprived of his liberty, causing him to suffer the injuries and damages set forth above.

WHEREFORE, Plaintiff, VICTOR CAMINATA, prays for such compensatory damages as are available pursuant to federal law. Plaintiff further seeks punitive damages pursuant to 42 USC §1983 as to the individual Defendants, together with pre-judgment interest, costs and attorney fees in an amount to be determined by the Court.

                              OLSMAN, MUELLER, WALLACE
                              & MacKENZIE, P.C.

                              s/Wolfgang Mueller
                              Wolfgang Mueller (P43728)
                              Attorneys for Plaintiff
                              2684 West Eleven Mile Road
                              Berkley, MI 48072
                              (248) 591-2300
                              wmueller@olsmanlaw.com

Dated: February 28, 2014

## **JURY DEMAND**

Plaintiff, VICTOR CAMINATA, by and through his attorneys, OLSMAN, MUELLER, WALLACE & MacKENZIE, P.C., hereby demands a jury trial in this matter.

                                  OLSMAN, MUELLER, WALLACE
                                  & MacKENZIE, P.C.

                                  s/Wolfgang Mueller
                                  Wolfgang Mueller (P43728)
                                  Attorneys for Plaintiff
                                  2684 West Eleven Mile Road
                                  Berkley, MI 48072
                                  (248) 591-2300
                                  wmueller@olsmanlaw.com

Dated:   February 28, 2014